**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Attorneys for Plaintiff and the Putative Class*

[*Additional counsel on signature page*]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEANNA RAHILL, on behalf of herself, and all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>QUEST DIAGNOSTICS and AMERICAN MEDICAL COLLECTION AGENCY,<br><br>*Defendants.* | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## I.  INTRODUCTION

1.      Plaintiff Deanna Rahill ("Plaintiff"), brings this action for herself and

on behalf of all persons similarly situated ("Class Members") whose personally

identifiable information ("PII") and/or personal health information ("PHI") was

compromised by Quest Diagnostics ("Quest") and/or American Medical Collection

Agency ("AMCA") when the information of up to 11,900,000 consumers may have been accessed as part of a breach of AMCA's computer database ("Quest/AMCA Data Breach").

## II.  JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 class members, and at least one class member is a citizen of a state different from Defendant and is a citizen of a foreign state.  The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.    Venue is proper in this District under 28 U.S.C. § 1391 because Quest is headquartered in, does business in, and is subject to personal jurisdiction in this District.  Venue is also proper because AMCA does business in this District, and because a substantial part of the events or omissions giving rise to the claims in this action occurred in or emanated from this District, including the decisions made by Quest's governance and management personnel or inaction by those individuals that led to the Quest/AMCA Data Breach.

## III.  PARTIES

### A.  Plaintiff

4.    Plaintiff Rahill is a citizen of the State of Florida.

5.    Plaintiff Rahill used the Quest Diagnostics facility located in Fort Myers, Florida on numerous occasions, and has had laboratory work conducted at the Fort Myers location recently.

6.    In or about early June of 2019, Plaintiff reviewed news accounts suggesting that Plaintiff's PII and PHI may have been compromised in the Quest/AMCA Data Breach.  In addition to the damages detailed herein, the Quest/AMCA Data Breach has caused Plaintiff Rahill to be at substantial risk for further identity theft.

**B.    Defendants**

7.    Defendant Quest is a Delaware corporation with its corporate headquarters located at 500 Plaza Drive, Secaucus, New Jersey.

8.    Defendant AMCA is a New York corporation with its corporate headquarters at 4 Westchester Plaza, Elmsford, New York.

## IV.    FACTUAL ALLEGATIONS

9.    On its website, www.questdiagnostics.com, Quest touts itself as "the world's leading provider of diagnostic information services."  Quest also states that it "[t]ouches the lives of 30 percent of American adult each year," "[s]erves about half of the physicians and hospitals in the U.S.," and has "[a]ccess to approximately 90% of U.S. insured lives

10.    Quest was listed among the 2018 Fortune 500 Companies and in the Forbes 2018 Global 2000.  In 2017, Quest's revenues were approximately $7.71 billion, again according to Quest's website.

11.    According to AMCA's website, www.amcaonline.com, "AMCA is one of the nation's top agencies managing over $1BN in annual receivables."

12.    Upon information and belief, Quest employs AMCA, a billing collections vendor, as its agent for collection of unpaid accounts and/or for other purposes.  In the course of that relationship, Quest entrusted AMCA with the PII and PHI of Quest's patient customers.  That PII and PHI included, among other things, credit card numbers, bank account information, medical information, and Social Security Numbers.

13.    On June 3, 2019, Quest filed a Form 8-K with the United States Securities and Exchange Commission.  In that Form 8-K, Quest stated that, on May 14, 2019, AMCA notified Quest and its revenue cycle management provider, Optum360, LLC, "of potential unauthorized activity on AMCA's web payment page."

14.    Quest's June 3, 2019 Form 8-K went on to state that, AMCA informed Quest and Optum360, LLC that "between August 1, 2018 and March 30, 2019 an unauthorized user had access to AMCA's system that contained information that AMCA had received from various entities, including Quest

Diagnostics, and information that AMCA collected itself; the information on AMCA's affected system included financial information (e.g., credit card numbers and bank account information), medical information and other personal information (e.g., Social Security Numbers); as of May 31, 2019, AMCA believes that the number of Quest Diagnostics patients whose information was contained on AMCA's affected system was approximately 11.9 million people; and AMCA has been in contact with law enforcement regarding the incident."

15.    Quest's June 3, 2014 Form 8-K also states that Quest "has insurance coverage in place for certain potential liabilities and costs relating to the incident; this insurance is limited in amount and subject to a deductible."

16.    In a statement that AMCA issued on June 3, 2019, AMCA stated that it had received "information from a security compliance firm that works with credit card companies of a possible security compromise" at AMCA.

17.    The Quest/AMCA Data Breach poses potential and actual problems for consumers, including the ability of a perpetrator to gain access to different areas of a victim's digital life (such as bank accounts, social media, and credit card details) and to harvest other sensitive data, as well as information belonging to family, friends, and colleagues.

18.    Healthcare and insurance companies have for years been on high alert due to the risk of a criminal cyber-attack or other data breach.  There have been a

number of high-profile data breaches in the industry, and the FBI and others have warned companies they will continue to be targets because they maintain sensitive, personal information that is also highly valuable to cybercriminals.  In particular, the combination of social security numbers, PII such as names, addresses, and birth dates, and PHI, including medical histories, allows criminals to engage in identity theft as well as medical fraud which, for example, can cause patients to receive a bill for medical treatment they never received or to be denied treatment because of inaccuracies in their records.

19.    Quest in particular knew about the risks from a data breach, since this is not the first time that PII and/or PHI entrusted to Quest by patients has been the subject of a data breach.  *Morrow v. Quest Diagnostics, Inc.*, Civil Action No. 17-948(CCC)(JBC), is an action pending in this District in which the plaintiff alleged that confidential information of over 34,000 Quest patients was compromised by a data breach.  According to the docket in *Morrow*, that case is the subject of a proposed classwide settlement, for which plaintiff is to file for preliminary settlement approval.  On May 31, 2019, plaintiff requested an extension of time, until June 30, 2019, to move for preliminary approval of that settlement.  *Morrow* ECF No. 94.

20.    At all relevant times, Quest and AMCA, as Quest's agent or otherwise, knew or should have known of their obligation to protect the personal

and financial data of Quest's patients because of their participation in the storage

of PII and PHI and their interactions with payment card processing networks.

Quest and AMCA were also aware of the significant repercussions if they failed in

their obligations because Quest and/or AMCA collected and/or had access to

payment card data from millions of Quest patients and knew that this data, if

compromised, would result in injury to consumers, including Plaintiff and Class

members.

21.    Quest has on its website a Notice of Privacy Practices.  That Notice

states, among other things that:

> Quest Diagnostics and its wholly owned subsidiaries (collectively
> "Quest Diagnostics") are committed to protecting the privacy of your
> identifiable health information.  This information is known as
> "protected health information" or "PHI."  PHI includes laboratory test
> orders and test results as well as invoices for the healthcare services
> we provide.  Quest Diagnostics is required by law to maintain the
> privacy of your PHI.  We are required to notify affected individuals in
> the event of a breach involving unsecured protected health
> information.  PHI is stored electronically and is subject to electronic
> disclosure.

22.    AMCA has on its website, under a heading titled "Morals and

Ethics," a statement that "[w]e are compliant with all Federal and State Laws and

are members of ACA International.  We provide our services adhering to the

ethical guidelines expected from a National Accounts Receivable Management

firm."  ACA International is an association of collection agencies that has

numerous resources for members regarding privacy practices and related

protections for confidential and protected information.

23.    Despite understanding the consequences of inadequate data security,

Quest and AMCA failed to take appropriate protective measures to protect and

secure patients' PII and PHI, including data belonging to Plaintiff and Class

members.

## V.    CLASS ALLEGATIONS

24.    Plaintiff brings this lawsuit as a class action on behalf of herself and

all other Class Members similarly situated pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(2), (b)(3), and/or (c)(4).  This action satisfies the

numerosity, typicality, adequacy of representation, predominance of common

issues, and superiority requirements of those provisions

25.    As alleged throughout this Complaint, Plaintiff's and the Class

Members' claims all derive directly from a single course of uniform and

standardized conduct by Quest and AMCA.  Defendants, and each of them, did not

differentiate, in their degree of care, their actions or inactions, or in the content of

their statements or omissions, among individual Class members.  The objective

facts on these subjects are the same for all Class members. Within each cause of

action asserted, the same legal standards govern.

26.     Pursuant to Rules 23(a); (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action and seek to certify and maintain it as a class action on behalf of herself and a Nationwide Class, as defined below, or, in the alternative, for statewide State Classes, as defined below.

27.     Plaintiff seeks a Nationwide Class (or State Classes) for damages under Rule 23(b)(3) for those Class Members who have experienced the theft of PII and/or PHI as a result of the Quest/AMCA Data Breach.

28.     Plaintiff seeks a Nationwide Class (or State Classes) for declaratory relief under Rule 23(b)(2) for those individuals who have not yet experienced the effect of the Quest/AMCA Data Breach.

## A.    <u>The Nationwide Class</u>

29.     The Nationwide Class is initially defined as follows:

All persons in the United States who provided PII, PHI, and/or other sensitive information (including but not limited to credit card information) to Quest and whose PII, PHI, and/or other sensitive information was accessed, compromised, and/or stolen from Quest or AMCA in the Quest/AMCA Data Breach.

## B.    <u>The State Classes</u>

30.     In the alternative to the Nationwide Class, Plaintiff alleges statewide class action claims on behalf of state-wide classes for certain states ("State Classes"). Each of these State Classes is initially defined as follows:

**Florida Class**

All citizens of Florida who provided PII, PHI, and/or other sensitive information (including but not limited to credit card information) to Quest and whose PII, PHI, and/or other sensitive information was accessed, compromised, and/or stolen from Quest or AMCA in the Quest/AMCA Data Breach.

**New Jersey Class**

All citizens of New Jersey who provided PII, PHI, and/or other sensitive information (including but not limited to credit card information) to Quest and whose PII, PHI, and/or other sensitive information was accessed, compromised, and/or stolen from Quest or AMCA in the Quest/AMCA Data Breach.

31.     The Nationwide Class and the State Classes and their members are sometimes referred to herein as the "Class" or "Classes."

32.     Excluded from the proposed Class are: (1) Quest and AMCA, any entity or division in which Quest or AMCA has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) any judicial officer to whom this case is assigned and his, her, or their immediate family and staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

**Numerosity**

33.    Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  Quest's June 3, 2019 Form 8-K states that AMCA believes that "the number of Quest Diagnostics patients whose information was contained on AMCA's affected system was approximately 11.9 million people."  Class Members are readily identifiable from information and records in Quest's and AMCA's possession, custody, or control.

**Typicality and Commonality**

34.    The claims of Plaintiff are typical of the claims of Class Members in that Plaintiff, like all Class Members, provided PII (including but not limited to credit card information) and PHI to Quest, which information Quest provided to AMCA, as its agent, and which was then accessed, compromised, and/or stolen in the Quest/AMCA Data Breach.

35.    Furthermore, the factual bases of Quest's and AMCA's misconduct are common to all Class Members, resulting, through the same course of events, in injury to all Class Members.

## Adequate Representation

36.     Plaintiff will fairly and adequately represent and protect the interests of the Class Members.  Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions.

37.     Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of Class Members, and have the financial resources to do so. Neither Plaintiff nor her counsel have interests adverse to those of Class Members.

## Predominance of Common Issues

38.     There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members.  These common legal and factual issues include:

        a.     Whether Class members' PII, PHI, and/or other confidential information was accessed, compromised, or stolen in the Quest/AMCA Data Breach;

        b.     Whether (and when) Quest and/or AMCA knew about any security vulnerabilities that led to the Quest/AMCA Data Breach before it was announced to the public and whether Quest and/or AMCA failed to timely notify the public of those vulnerabilities and the Quest/AMCA Data Breach;

c.      Whether Quest's representations regarding its privacy obligations and practices relating to the protection of PII, PHI, and/or other sensitive information of Plaintiff and Class members were facts that reasonable persons could be expected to rely upon when deciding whether to use Quest's services;

d.      Whether such representations were false with regard to storing and safeguarding Plaintiff and Class members' PII, PHI, and/or other sensitive information;

e.      Whether Quest misrepresented the safety and security of its systems and services, and its ability, and that of its agent, AMCA, to safely store Plaintiff and Class members' PII, PHI, and other sensitive information;

f.      Whether such representations were material with regard to storing and safeguarding Class members' PII, PHI, and/or other sensitive information.

g.      Whether Quest concealed material and crucial information about its inadequate data security measures from Plaintiff and the Class;

h.      Whether Quest and/or AMCA knew or should have known that it did not employ reasonable measures to keep Plaintiff's and Class members' PII, PHI, and/or other sensitive information secure and prevent the loss or misuse of that information;

i.    Whether Quest and/or AMCA owed a duty to Plaintiff and the Class to safeguard their PII, PHI, and/or other sensitive information, and to implement adequate data security measures;

j.    Whether Quest and/or AMCA breached that duty;

k.    Whether Quest and/or AMCA failed to "implement and maintain reasonable security procedures and practices" for Plaintiff's and Class members' PII, PHI, and/or other sensitive information in violation of Section 5 of the Federal Tort Claims Act, 15 U.S.C. § 45 ("FTCA");

l.    Whether Defendant violated the Florida Deceptive and Unfair Trade Practices Act, § Fla. Stat. § 501.201 *et seq.* ("FDUTPA"), by failing to inform consumers (including Plaintiff and the Class Members) of its unsecure, non-compliant, and otherwise insufficient data and information security practices;

m.    Whether Quest and/or AMCA violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.,* by failing to inform consumers (including Plaintiff and the Class Members) of its unsecure, non-compliant, and otherwise insufficient data and information security practices.

## **Superiority**

39.    Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Quest's and AMCA's wrongful conduct.  A

class action is superior to other available methods for the fair and efficient adjudication of this controversy.

40.    Absent a class action, all or virtually all Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that few if any Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

41.    Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## VI.    <u>CAUSES OF ACTION</u>

<u>FIRST CAUSE OF ACTION</u>
**NEGLIGENCE**
**[Applicable to the Nationwide Class and/or the Florida Class]**

42.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

43.    Quest and AMCA, as Quest's agent, owed a duty to Plaintiff and the Class to exercise reasonable care in safeguarding and protecting their PII, PHI, and

other sensitive information, and keeping it from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing their respective security systems to ensure such information of Plaintiff and the Class was adequately secured and protected, including using encryption technologies. Quest and AMCA further had a duty to implement processes that would detect a breach of their respective security systems in a timely manner. Moreover, having provided PII, PHI, and other sensitive information to AMCA, as Quest's agent, Quest had a duty to ensure that AMCA designed, maintained, and tested its security systems to ensure such information of Plaintiff and the Class was adequately secured and protected, including using encryption technologies. Quest further had a duty to implement processes that would detect a breach of AMCA's security system in a timely manner.

44.    By being entrusted by Plaintiff and the Class to safeguard their PII, PHI, and other sensitive information, Quest and its agent, AMCA, had a special relationship with Plaintiff and the Class. Plaintiff and the Class signed up for and paid for Quest's services and agreed to provide their PII, PHI, and other sensitive information with the understanding that Quest and its agents would take appropriate measures to protect it, and would timely inform Plaintiff and the Class

of any breaches or other security concerns that might call for action by Plaintiff and the Class.

45.    Quest and its agent, AMCA, failed to take appropriate measures to protect the PII, PHI, and other sensitive information of Plaintiff and the Class. Defendants are morally culpable, given the prominence of security breaches in the healthcare industry, and especially given the prior *Morrow* case regarding another Quest data breach.  Any purported safeguards that Quest and/or AMCA had in place where wholly inadequate, and Quest and AMCA wrongfully failed to notify Plaintiff and the Class in timely fashion of breaches or security vulnerabilities.

46.    Quest and its agent, AMCA, breached their duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class members' PII, PHI, and other sensitive information by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite Quest's prior data breach, reflected in the *Morrow* case, and other data breaches in the healthcare industry, and allowing unauthorized access to Plaintiff's and the other Class Members' PII, PHI, and other sensitive information.

47.    The failure of Quest and its agent, AMCA, to comply with industry and federal regulations further evidences Defendants' negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII, PHI, and other sensitive information.

48.     The breaches of these duties by Quest in particular were not merely isolated incidents or small mishaps.  Rather, the breaches of the duties set forth above resulted from a long-term companywide refusal by Quest to acknowledge and correct serious and ongoing data security problems again, as evidenced by the prior data breach that is the subject of the *Morrow* case.

49.     But for Defendants' wrongful and negligent breach of their duties to Plaintiff and the Class, patients' PII, PHI, and other sensitive information would not have been compromised, stolen, and viewed by unauthorized persons. Defendants' negligence was a direct and legal cause of the theft of the PII, PHI, and other sensitive information of Plaintiff and the Class and all resulting damages.

50.     The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class members' PII, PHI, and other sensitive information.  Defendants knew or should have known that their respective systems and technologies for processing and securing the PII, PHI, and other sensitive information of Plaintiff and the Class had security vulnerabilities, and Quest knew or should have known that AMCA's systems and technologies were similarly vulnerable.

51.     As a result of this misconduct by Defendants, the PII, PHI, and other sensitive information of Plaintiff and the Class was compromised, placing them at

a greater risk of identity theft and subjecting them to identity theft, and their PII,

PHI, and other sensitive information has been or may be disclosed to third parties

without the consent of Plaintiff and the Class.  Plaintiff and the Class have also

suffered consequential out-of-pocket losses for procuring credit freeze or

protection services, identity theft monitoring, and other expenses relating to

identity theft losses or protective measures.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**[Applicable to the Nationwide Class and/or the Florida Class]**

52.    Plaintiff incorporates by reference all preceding allegations as though

fully set forth herein.

53.    Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair . . . practices

in or affecting commerce," including, as interpreted and enforced by the FTC, the

unfair act or practice by businesses, such as Defendants, of failing to use

reasonable measures to protect PII.

54.    Defendants violated Section 5 of the FTCA by failing to use

reasonable measures to protect PII, PHI, and other sensitive information and not

complying with applicable industry standards, as described in detail herein.

Defendants' conduct was particularly unreasonable given the nature and amount of

PII, PHI, and other sensitive information that Quest obtained and shared with its

agent, AMCA (information from approximately 11,900,000 patients), and the

foreseeable consequences of a data breach at a healthcare company as large as Quest, including, specifically, the immense damages that would result to Plaintiff and Class members.

55.    Defendants' violation of Section 5 of the FTCA constitutes negligence *per se.*

56.    Plaintiff and Class members are within the class of persons that the FTCA was intended to protect.

57.    The harm that occurred as a result of the Quest/AMCA Data Breach is the type of harm the FTCA was intended to guard against.  The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

58.    As a direct and proximate result of Defendants' negligence *per se,* Plaintiff and the Class have suffered, continue to suffer, and anticipate suffering, injuries and damages arising from identity theft; inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Quest/AMCA Data Breach, and/or false or fraudulent charges stemming from the Quest/AMCA Data Breach, including but not limited to late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Quest/AMCA Data Breach

on their lives, including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports;, and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy.

59.    Additionally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class members have suffered and will suffer the continued risks of exposure of their PII, PHI, and other sensitive information, which remain in the possession of one or both Defendants and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate protective measures.

## THIRD CAUSE OF ACTION
### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201, *et seq.*
### [Applicable to the Florida Class]

60.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

61.    The purpose of the FDUTPA is to "protect the consuming public...from those who engage in unfair methods of competition, or

unconscionable, deceptive or unfair acts or practice in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

62.    Plaintiff is both a "consumer" as defined by Fla. Stat. § 501.203(7), as well as a person, generally referenced in the FDTUPA, and the subject transaction is "trade or commerce" as defined by Florida Statute § 501.203(8).

63.    The FDUPTA was enacted to protect the consuming public and legitimate business enterprises from those who engage in unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce, and in unfair methods of competition. For the reasons discussed herein, Defendants violated FDUPTA by engaging in the unconscionable, deceptive, unfair acts or practices described herein and proscribed by Florida Statutes §§ 501.201, *et seq*., and 501.171, *et seq*., as well as those acts proscribed by Section 5 of the FTC Act.

64.    Defendants' unconscionable, deceptive, and unfair acts and practices described herein were likely to, and did in fact, deceive members of the public, including consumers and persons (like Plaintiff) acting reasonably under the circumstances and to their detriment. In committing the acts alleged herein, Defendants engaged in unconscionable, deceptive, and unfair acts and practices acts by failing to timely notify Florida residents of the Quest/AMCA Data Breach, which constitutes an unfair or deceptive trade practice in the conduct of commerce in violation of the FDUPTA. Fla. Stat. §§ 501.201, *et seq*., 501.171, *et seq*.

65. By failing to inform consumers (including Plaintiff and Class Members) of its own and unsecure, non-compliant, and otherwise insufficient data and information security practices, advertised, sold, serviced, and otherwise induced those consumers (including Plaintiff and Class Members) to purchase services from Quest, in violation of the FDUTPA.

66. By failing to inform consumers (including Plaintiff and Class Members) of its own unsecure, uncompliant, and otherwise insufficient data and information security practices, Quest falsely represented the security of its data and information security practices to safeguard the PII, PHI, and other sensitive information that Quest collected on consumers (including Plaintiff and Class Members), in violation of the FDUTPA

67. Additionally, Defendants violated Section 5 of the FTC Act, and therefore the FDUTPA, by failing to use reasonable measures to protect personal information and not complying with industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of personal information it obtained and stored and the foreseeable consequences of a data breach.

68. In committing the acts alleged above, Defendants engaged in unconscionable, deceptive, and unfair acts and practices, proscribed by Florida law.

69.    Defendants' conduct is unconscionable, deceptive, and unfair, as it is likely to, and did, mislead consumers acting reasonably under the circumstances. As a direct and proximate result of Defendants' conduct, Plaintiff and other members of the Class have been harmed, in that they were not timely notified of the Quest/AMCA Data Breach, which resulted in profound vulnerability to their personal information and other financial accounts.

70.    Plaintiff reserves the right to allege other violations of FDUPTA as discovery unfolds and as Defendants' conduct is ongoing. As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiff has been damaged and is entitled to recover actual damages, to the extent permitted by law, including Fla. Stat. § 501.211, in an amount to be proven at trial.

71.    In addition, pursuant to Fla. Stat. § 501.211, Plaintiff seeks equitable relief and to enjoin Defendants on terms the Court considers reasonable. Plaintiff also seeks reasonable attorneys' fees and costs, as prescribed by §§ 501.211(2) Florida Statutes (2009).

**FOURTH CAUSE OF ACTION**
**VIOLATION OF NEW JERSEY'S**
**CONSUMER FRAUD ACT, N.J.S.A. 56:8-1** *et seq.*
**[Applicable to the Nationwide Class]**

72.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

73.     The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.* ("NJCFA"), protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…"  N.J.S.A. 56:8-2.

74.     By failing to inform consumers (including Plaintiff and Class Members) of its own and unsecure, non-compliant, and otherwise insufficient data and information security practices, advertised, sold, serviced, and otherwise induced those consumers (including Plaintiff and Class Members) to purchase services from Quest, in violation of the NJCFA.

75.     By failing to inform consumers (including Plaintiff and Class Members) of its own unsecure, uncompliant, and otherwise insufficient data and information security practices, Quest falsely represented the security of its data and information security practices to safeguard the PII, PHI, and other sensitive information that Quest collected on consumers (including Plaintiff and Class Members), in violation of the NJCFA.

76.     By failing to inform consumers (including Plaintiff and Class Members) of the fact that AMCA had been entrusted with their PII, PHI, and other sensitive information, Quest violated the NJCFA.

77.    Plaintiff and other Class Members' damages are the direct and foreseeable result of Defendant's unlawful conduct.

## **RELIEF REQUESTED**

78.    WHEREFORE, Plaintiff, on behalf of herself, and all others similarly situated, request the Court to enter judgment against Defendants, jointly and severally, as follows:

a.    an order certifying the proposed Class and/or any appropriate subclasses, designating Plaintiff as named representative of the Class, and designating the undersigned as Class Counsel;

b.    a declaration that: Class Members' PII, PHI, and other sensitive information was accessed, compromised, or stolen in the Quest/AMCA Data Breach; Defendants knew about security vulnerabilities that led to the Quest/AMCA Data Breach before it was announced to the public; Defendants' representations that they would secure and protect the PII, PHI, and other sensitive information of Plaintiff and Class members were facts that reasonable persons could be expected to rely upon when deciding whether to use Quest's services; such representations were false with regard to storing and safeguarding Plaintiff and Class members' PII, PHI, and other sensitive information; and Quest and its agent, AMCA, misrepresented and failed to disclose material facts about the safety

and security of their systems and services, and their ability to safely store

Plaintiff's and Class Members' PII, PHI, and other sensitive information;

       c.     a declaration that Defendants owed a duty to Plaintiff and the

Class to safeguard their PII, PHI, and other sensitive information and to implement

adequate data security measures;

       d.     a declaration that Defendants breached that duty;

       e.     a declaration that Defendants have failed to "implement and

maintain reasonable security procedures and practices" for Plaintiff's and Class

Members' PII, PHI, and other sensitive information in violation of Section 5 of the

FTCA;

       f.     a declaration that Defendants have violated the Florida

Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201 *et seq.*; and the New

Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.;*

       g.     an order enjoining Defendants from further deceptive practices;

       h.     an award to Plaintiff and Class members of compensatory,

exemplary, and statutory damages, including interest, in an amount to be proven at

trial;

       i.     an award of attorneys' fees and costs as allowed by law;

       j.     an award of pre-judgment and post-judgment interest, as

provided by law;

k.    leave to amend this Complaint to conform to the evidence

produced at trial; and

l.    such other relief as may be appropriate under the circumstances.

## **<u>DEMAND FOR JURY TRIAL</u>**

79.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a

trial by jury of any and all issues in this action so triable of right.

**LITE DEPALMA GREENBERG LLC**

   */s/ Bruce D. Greenberg*

Dated: June 7, 2019          Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 877-3820
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

**SAUDER SCHELKOPF, LLC**
Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
Telephone: (610) 200-0580
Facsimile: (610)727-4360
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com

***Counsel for Plaintiff and the Putative Class***

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not related to any other action, pending arbitration or administrative proceeding currently pending in any court.

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**LITE DEPALMA GREENBERG LLC**

Dated: June 7, 2019

*/s/ Bruce D. Greenberg*
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 877-3820
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

**SAUDER SCHELKOPF, LLC**
Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
Telephone: (610) 200-0580
Facsimile: (610)727-4360
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com

***Counsel for Plaintiff and the Putative Class***